**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-2119-17T2

AMBER MONSERRATE,

     Plaintiff-Respondent,

v.

B&D AUTO SALES, INC.,

     Defendant-Appellant.

_____

          Submitted April 30, 2019 – Decided June 12, 2019

          Before Judges Yannotti and Rothstadt.

          On appeal from Superior Court of New Jersey, Law Division, Burlington County, Docket No. DC-000080-17.

          Antonio J. Toto, attorney for appellant.

          Respondent has not filed a brief.

PER CURIAM

Defendant B&D Auto Sales, Inc. appeals from a judgment awarding plaintiff $8,868.39, plus court costs. We affirm in part, reverse in part, and remand for entry of a revised judgment.

I.

On January 5, 2017, plaintiff filed a pro se complaint in the Special Civil Part, asserting a claim under the Consumer Fraud Act (CFA), N.J.S.A. 56:8-1 to -210. The judge conducted a trial in the matter on May 1, 2017. Plaintiff appeared without an attorney.

At the trial, plaintiff testified that on October 19, 2016, she purchased a 2004 Ford Expedition from defendant, with a reported 93,808 miles on the odometer. The purchase agreement stated that the vehicle was being sold "as is." It also stated that the "dealer . . . expressly disclaims all warranties, either express or implied, including any implied warranties of merchantability and fitness for a particular purpose."

Plaintiff testified that she first saw the vehicle in an online advertisement, which indicated that the Expedition "was a vehicle of great quality at a great price." Plaintiff said she was familiar with defendant, having previously purchased a vehicle at that dealership. According to plaintiff, defendant's representative, a person named "Patrick," suggested to her that the Expedition

2

was safe and "in great shape." Plaintiff said "Patrick" told her not to worry, since she would have a warranty obtained through the financing company.

The purchase price was $11,576.40, which included $8980 for the vehicle, $1540 for the warranty or service contract issued by A.U.L. Corp., sales tax of $736.40, a messenger fee of $68.50, notary and tag fees of $15, a registration title fee of $131.50, and a document fee of $105. Plaintiff made a cash deposit of $1556.40, and financed the balance through Pelican Auto Finance (Pelican).

Plaintiff testified that within two or three days after she took possession of the Expedition, she started to smell gasoline inside the vehicle. She returned to defendant and was told she may have put too much fuel in the tank. Plaintiff then had problems with the heating and air conditioning system. Defendant informed her that a part had to be ordered; however, the repair was never made.

On November 22, 2016, the brakes on the Expedition failed while plaintiff was driving. Plaintiff had the vehicle towed to defendant's "preferred mechanic." Later, defendant instructed plaintiff that before the brake repairs could be made, she had to take the vehicle to a body shop to be evaluated.

Plaintiff claimed the Expedition had extensive damage to its frame. She also claimed that roofing material had been nailed between "the bottom of the door frame and the undercarriage of the vehicle in order to hide [the] rust[.]"

3

She claimed that nails had "started to lift up because the rust underneath was so bad" it could not hold the nails to the body of the vehicle.

Plaintiff provided the judge with photos of the undercarriage.[1] The judge observed that the photos appeared to show that the material had been painted. Plaintiff testified that Jeff Barris, defendant's President, told her that the repair was "cosmetic" and it had nothing to do with the safety or operation of the vehicle.

Later, defendant informed plaintiff that the shop could not make the repairs. Defendant offered to take the vehicle back and give plaintiff a credit of $500, which she could apply to purchase another vehicle on defendant's lot. Defendant told plaintiff that if she did not accept the offer, she would be required to pay $50 per day for her use of the vehicle. Defendant also told plaintiff she had to seek refunds of the sales tax and vehicle registration fees from the State.

Plaintiff further testified that Pelican rescinded the loan before she was obligated to make any payments, and A.U.L. cancelled the service contract. Plaintiff said she paid $499.90 for auto insurance on the Expedition. Plaintiff further testified that after she returned the vehicle to defendant, she needed

---

[1] Defendant has not provided this court with copies of the photographic evidence.

A-2119-17T2

transportation for herself, her children, and her husband, so she had her 2002 Dodge Caravan repaired. She claimed $899.83, as the costs to repair the Caravan.

After the trial court denied defendant's motion to dismiss plaintiff's complaint, Barris testified. Barris stated that defendant purchased the Expedition at a dealer auction in Philadelphia. He explained that the purchaser at the auction has "[twenty-four] hours to check the car out and make sure it's good." According to Barris, the Expedition was taken for a test drive at the auction site. He said "the car ran good." There was "no engine light" and "no issues with the car at all." Barris decided to proceed with the purchase of the vehicle.

Barris stated that the Expedition was delivered to defendant, and defendant created a video, which was posted on YouTube, which he described as a "basically generic . . . video." The video mentioned the "Carfax guarantee," which indicates that Carfax had not received any report that the Expedition was damaged or had been in an accident.

Barris disputed plaintiff's contention that the Expedition had frame damage. He stated that any such damage would have been noted on the Carfax

report. He also stated that photos of the vehicle show surface rust on the bottom of the frame, but he insisted this was not frame damage.

Barris said the Expedition's brake line had failed, which was not something out of the ordinary for vehicles of that age. He testified that in this case, "one of the [brake] lines cracked." He explained that this caused the brake fluid to leak out and sent the "brakes to the floor[.]" Barris attributed this to "wear and tear." He stated that the Expedition was later repaired, and defendant put the vehicle "up for sale again."

Barris asserted that defendant has been in business for many years, and it does not engage "in any kind of fraud." He stated that defendant always sells its vehicles "as is" because defendant does not repair vehicles, but it provides purchasers with a warranty company that issues a service contract. He stated that the service contract issued to plaintiff did not cover the problem with the brakes or the surface rust.

After hearing closing arguments, the trial judge placed an oral decision on the record. The judge found plaintiff's testimony to be credible. The judge determined that plaintiff had established a violation of the CFA because defendant knowingly concealed material facts concerning the Expedition, and also violated an administrative regulation, which requires a dealership to

6

disclose if a motor vehicle has been previously damaged or had substantial repairs or body work.

The judge noted that the photos of the vehicle showed rust on the undercarriage and that "some type of roofing materials" had been used to repair the body. The judge stated that defendant had concealed material facts concerning the condition of the Expedition. The judge also stated that defendant had engaged in an unconscionable commercial practice because defendant failed to disclose prior problems with the vehicle.

The judge found that plaintiff had established the following damages: the down payment of $1556.40, $499.90 to insure the Expedition, and $899.83 to repair the Caravan. The judge noted that plaintiff had been planning to get "rid of" the Caravan when she purchased the Expedition, but "she was forced to make repairs to" the Caravan "in order to transport herself and her family."

The judge decided that plaintiff had sustained an ascertainable loss in the amount of $2956.13, which she trebled pursuant to N.J.S.A. 56:8-19. The judge entered an order awarding plaintiff $8868.39, with court costs. Defendant's appeal followed. Thereafter, the judge filed a letter opinion pursuant to Rule 2:5-1(b) amplifying the reasons for her decision.

On appeal, defendant argues that plaintiff did not establish that defendant engaged in an unlawful practice in violation of the CFA. We disagree.

Where, as here, the court conducts a trial, sitting without a jury, the court's findings of fact are "binding on appeal when supported by adequate, substantial and credible evidence." Rova Farms Resort, Inc. v. Inv'rs Ins. Co. of Am., 65 N.J. 474, 483-84 (1974) (citing N.J. Turnpike Auth. v. Sisselman, 106 N.J. Super. 358, 370 (App. Div. 1969)). We note, however, that on appeal, "[a] trial court's interpretation of the law and the legal consequences that flow from established facts are not entitled to any special deference." Manalapan Realty, LP v. Twp. Comm. of Manalapan, 140 N.J. 366, 378 (1995) (citations omitted).

"The CFA was enacted to 'provide[] relief to consumers from "fraudulent practices in the market place."'" Dugan v. TGI Fridays, Inc., 231 N.J. 24, 50 (2017) (alteration in original) (quoting Lee v. Carter-Reed Co., 203 N.J. 496, 521 (2010)). The CFA provides that

> [t]he act, use or employment by any person of any unconscionable commercial practice, deception, fraud, false pretense, false promise, misrepresentation, or the knowing[] concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale or advertisement of any merchandise or real estate, or with the subsequent performance of such

person as aforesaid, whether or not any person has in fact been misled, deceived or damages thereby, is declared to be an unlawful practice . . . .

[N.J.S.A. 56:8-2.]

An "unlawful practice" that violates the CFA may be established with proof of "(1) an affirmative act; (2) a knowing omission; or (3) a violation of an administrative regulation." Dugan, 231 N.J. at 51 (citing Thiedemann v. Mercedes-Benz USA, LLC, 183 N.J. 234, 245 (2005); Cox v. Sears Roebuck & Co., 138 N.J. 2, 17 (1994)). "A showing of intent is not essential if the claimed CFA violation is an affirmative act or a regulatory violation, but such a showing is necessary if the claimed violation is an omission pursuant to N.J.S.A. 56:8-2." Ibid. (citing Bosland v. Warnock Dodge, Inc., 197 N.J. 543, 556 (2009); Gennari v. Weichert Co. Realtors, 148 N.J. 582, 605 (1997); Cox, 138 N.J. at 17-18).

Here, plaintiff claimed that defendant engaged in an "unlawful practice" by selling the Expedition without disclosing the serious defects in the vehicle. The trial court found that defendant engaged in conduct deemed to be unlawful under N.J.S.A. 56:8-2 because "it clearly misrepresented and concealed material facts relating to the sale of the vehicle" and intended that plaintiff would rely thereon. The court decided that defendant misrepresented that the vehicle was

A-2119-17T2

in good condition, despite its body damage, and further misrepresented that if anything went wrong with the vehicle, the service contract would cover the problem.

On appeal, defendant argues that plaintiff presented no testimony or evidence that defendant had knowledge of any prior repair or body work on the Expedition. Defendant asserts that when it purchased the car, it "had no issues[,]" and the Carfax report indicated that no prior accidents or damage had been reported. We disagree.

There is sufficient credible evidence to support the trial court's finding that defendant misrepresented and concealed material facts concerning the condition of the Expedition, with the intent that plaintiff would rely thereon and purchase the vehicle. The record supports the court's determination that defendant engaged in a knowing omission or concealment, which is an unlawful practice under N.J.S.A. 56:8-2.

Defendant further argues that the trial court erred by finding that it violated N.J.A.C. 13:45A-26A.7(a)(7), a regulation that applies to advertisements for the sale or lease of new or used vehicles. The regulation states that the following practice is unlawful:

> The failure to disclose that the motor vehicle had been previously damaged and that substantial repair or body

work has been performed on it when such prior repair or body work is known or should have been known by the advertiser; for the purpose of this subsection, "substantial repair or body work" shall mean repair or body work having a retail value of $1,000 or more[.]

[Ibid.]

Defendant contends expert testimony was required to show that substantial repair or body work, having a value of $1000 or more, was performed on the vehicle. We need not address defendant's contention that expert testimony was required because plaintiff failed to present sufficient evidence to show "that substantial repair or body work has been performed" on the Expedition and that such repair or body work had "a retail value of $1,000 or more." See ibid.

The photographic evidence that plaintiff presented to the trial court apparently showed damage to the body of the Expedition and a rusty frame. It appears that the body was repaired in some fashion, but there is no evidence from which an inference could be drawn that the repairs had a retail value of $1000 or more. In addition, it appears that the frame had not been repaired before defendant sold the Expedition to plaintiff.

Therefore, we conclude the evidence supported the trial court's finding that defendant engaged in an unlawful practice under N.J.S.A. 56:8-2 by

knowingly concealing the condition of the vehicle when it was advertised and sold to plaintiff. However, the evidence does not support the court's finding that defendant violated N.J.A.C. 13:45A-26A.7(a)(7).

III.

Defendant also argues that plaintiff failed to show that she sustained an ascertainable loss as a result of its alleged unlawful practice under the CFA. Defendant therefore argues that the court erred by awarding plaintiff damages of $8868.39.

To obtain an award of damages on a CFA claim, the plaintiff must prove "'an ascertainable loss . . .' and 'a causal relationship between the unlawful conduct and the ascertainable loss.'" Dugan, 231 N.J. at 52 (quoting D'Agostino v. Maldonado, 216 N.J. 168, 184 (2013)). Therefore, under the CFA, a plaintiff can only be awarded damages if the plaintiff "demonstrate[s] a loss attributable to the conduct made unlawful by the CFA." Id. at 53 (quoting Thiedemann, 183 N.J. at 246).

On appeal, defendant argues that plaintiff did not suffer an ascertainable loss of her down payment, which was $1556.40. We disagree. It is undisputed that defendant did not return that payment when it agreed to the return of the

vehicle.  The purchase agreement states that the total price included sales tax in the amount of $736.40, plus registration, tag, and title fees totaling $320.

The record also shows that the purchase price included $1540 for the A.U.L. service contract.  Plaintiff testified at trial that A.U.L. cancelled the contract.  There is nothing in the record to support defendant's assertion that A.U.L. required plaintiff to pay $500 for her use of the vehicle before she returned the vehicle and the service contracted rescinded.

Moreover, the record includes a document entitled "Instant Delivery Conditions," which plaintiff signed along with the purchase contract.  The document states in pertinent part:

> It is also my understanding that if my credit is found to be unsatisfactory or unacceptable to any of the dealership's financing institutions, or if any term or condition of the sale is not satisfied, I will promptly return the vehicle to the dealership upon the dealership's request.  I agree that if the vehicle is not returned to the dealership within [twenty-four] hours of the dealership[']s request, I agree to permit the dealership to take any and all action to recover possession of the vehicle.  I agree and will be charged a $250 credit application fee along with a fee of $50.00 per day for use charges.  There will be a $5.00 temporary tag fee, along with Fed-Ex fees for shipment of said documents to the finance company.

This condition was inapplicable because there is no evidence that plaintiff's credit was "unsatisfactory or unacceptable" or that plaintiff did not

satisfy a condition of the agreement. Plaintiff returned the Expedition because the brakes failed and the frame had rust damage. There is nothing in the record to support defendant's claim that plaintiff was required to pay $50 a day for the use of the Expedition before it was returned.

Furthermore, there is no merit to defendant's contention that plaintiff did not suffer an ascertainable loss of the sales tax or registration, tag, and title fees that she paid. Defendant asserts that plaintiff must file claims with the State for refunds of these payments. There is, however, no assurance the State would refund the monies paid. In addition, the record shows that plaintiff paid defendant the sales tax and fees, and would not have done so had defendant not engaged in unlawful practices in violation of the CFA.

We also reject defendant's contention that plaintiff did not suffer an ascertainable loss of $499, which defendant claims plaintiff paid to obtain auto insurance for the Expedition and the Caravan. Plaintiff testified that she made payments of $311 and $188 to insure the Expedition and that she paid an additional $119 to insure the Caravan. Thus, the payments totaling $499 were to obtain insurance for the Expedition.

Defendant argues that the monies plaintiff paid to insure the Expedition are not recoverable because plaintiff was legally obligated to have auto

14

insurance. Again, we disagree. Plaintiff incurred that expense because she purchased the Expedition, and would not have done so, but for defendant's violation of the CFA.

We therefore conclude that the record supports the trial court's determination that plaintiff suffered an ascertainable loss of her down payment of $1556.40 and the $499 she spent to obtain auto insurance for the Expedition. However, we reach a different conclusion with regard to the $899.83 plaintiff spent to repair the Caravan.

The Caravan required repairs, but plaintiff did not incur that expense due to defendant's violation of the CFA, which pertained only to the sale of the Expedition and the losses plaintiff sustained in that transaction. Plaintiff testified that after she returned the Expedition, she needed a car to transport herself and her family. Even so, the court erred by requiring defendant to bear the cost to repair the Caravan. In our view, plaintiff failed to establish a sufficient nexus between defendant's unlawful practices that violated the CFA and the repairs plaintiff had made to the Caravan.

Therefore, plaintiff's ascertainable loss was $2055.40, not $2956.13, as found by the trial court. When trebled pursuant to N.J.S.A. 56:8-19, the damage

award should be $6166.20, plus court costs.  We remand the matter for entry of a revised judgment in that amount.

Affirmed in part, reversed in part, and remanded to the trial court for entry of a revised judgment in accordance with this opinion.  We do not retain jurisdiction.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION